The case of Westbrook v. Gleason, 79 N. Y. 23, 29, 30, Greene v. Warnick, 64 N. Y. 220, and numerous other cases, many of them cited in the "Note on Title Acquired by Assignee of Mortgage," appended to Squire v. Greene (Sup.) 52 N. Y. Supp. 1013, seem fully to sustain the doctrine that an assignee of a mortgage takes no other or greater rights than the assignor. The recording acts cannot affect the question arising in this case, because it is well recognized that "the only effect of recording an assignment of a mortgage is to protect the assignee against a subsequent sale of the same mortgage" (Greene v. Warnick, 64 N. Y. 226, 227), a situation not here presented. It follows that the action is prematurely brought, and judgment will be rendered in favor of the defendants.

Judgment for defendants.

---

### NEWTON v. NEW YORK, N. H. & H. R. CO. et al.

(Supreme Court, Appellate Division, First Department. July 7, 1905.)

1. DAMAGES—PERSONAL INJURIES—FRIGHT AND NERVOUS SHOCK.

    One cannot recover damages for fright or nervous shock occasioned by the negligence of another, where there is no physical injury.

    [Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Damages, § 100.]

2. SAME—EXPERT TESTIMONY.

    In an action for personal injuries, expert testimony that a certain difficulty from which plaintiff suffered might have been caused by the nervous shock incident to the accident was incompetent.

    [Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, § 2336.]

    Laughlin, J., dissenting.

Appeal from Trial Term.

Action by Alfred W. Newton against the New York, New Haven & Hartford Railroad Company and another. From a judgment against the New York Central & Hudson River Railroad Company, defendant, and from an order denying its motion for a new trial, the defendant last named appeals. After death of plaintiff subsequent to entry of judgment and order, the action was continued in name of Viva Newton, as his executrix. Reversed.

Argued before O'BRIEN, P. J., and McLAUGHLIN, INGRAHAM, and LAUGHLIN, JJ.

Charles C. Paulding, for appellant.

F. Angelo Gaynor, for respondent.

INGRAHAM, J. The plaintiff was a passenger upon one of the cars of the New York Central & Hudson River Railroad Company coming into the city of New York on the 6th day of January, 1902. The New York, New Haven & Hartford Railroad Company, as an entrance into New York, uses the tracks of the defendant the New York Central & Hudson River Railroad Company, under an arrangement with that road. While coming through a tunnel approaching the depot in the city of New York, the train upon which the plaintiff was a passenger stopped, and one of the trains of the

New York Central & Hudson River Railroad Company ran into it. As the result of this collision, many of the passengers in the rear cars were injured. The plaintiff was in the front passenger car of the New Haven Railroad train, and he claimed to have been injured, and commenced this action to recover for such injury against both railroad companies. Upon the trial the action against the New Haven Company was dismissed by consent, and the plaintiff's testator obtained a verdict against the New York Central Company. Subsequent to the trial, plaintiff died, and the action was continued by his executrix. The plaintiff's testator was examined on the trial, and his testimony as to the collision is as follows:

"I resided in Stamford, Connecticut, and on the morning of the 8th day of January, 1902, I left Stamford for New York on the 7:14 train of the New York, New Haven & Hartford Railroad. I met some friends on the train, and went into the smoker. That was next to the baggage car. I was playing whist in that car with Mr. Ferris, Mr. Lockwood, and Dr. Purley. We were sitting opposite to one another. I had a card board in my lap. The train went along on coming to New York until it got into the tunnel, and then, for some reason or other, it stopped in the tunnel. A portion of the train was in the tunnel, and a portion was outside. I was in the portion that was outside. The first thing that happened after the train was standing in this position was that a train ran into us. * * * It was quite a heavy crash—a very heavy crash. It just threw me over in the seat. I did not think much of it at the time. The board was in our laps, and it did not upset, or anything in that way; but just a heavy crash, and threw me forward. When the crash came it was unexpected, and I did not think much about it at the time, just as it was made at the time. Of course, the sensation was such that it was unexpected, and I don't know how I could explain it to you. It was so quick, you know, that there was nothing to it. We sat there for a few seconds, maybe a minute or so, playing cards. and, when we looked out, Dr. Purley called our attention to them carrying the dead—or at least I won't say carrying the dead, but carrying the wounded —and, when we got up and went out to where the wreck was, we stood there. I saw the cars there. Dr. Purley and I climbed over the fence, and he went his way, and I went down to the office. I felt no pain or anything that day. I did nothing that day at all. I was kind of nervous, and stayed around the office for a while, and then went out and went home. As to in what respect I was nervous; I cannot give it any other way than to say I felt shaky. I began to feel shaky that day right after I got to the office, and my comrades in the office advised me to go home. I was glad to get home. When I got there I felt nervous and shaky. * * * I kept getting worse and worse. I had to get help to get home in the evening. I mean by that that my wife and a friend of mine used to come down and meet me to bring me home. My physical condition was different from what it was before the accident, because I could not catch my breath, and they had to help me up the hill. There was quite a hill that I had to walk up every night to my home. Before the accident I could walk with any men in the town, almost. I was in the habit of walking up that hill every night when I came from New York. I was not short-winded before that, and I was always able to walk up without aid or assistance. After the accident, and after I came to New York to attend to my work, I was not able to walk up this hill alone. The doctor forbade me, but I had to walk up the hill. I could not breathe when I would get there—couldn't get my wind. That has continued ever since the wreck until the present time. I have felt no other effects than being short of wind and having these spells come on me. * * * Within two or three days after the accident I commenced gradually getting worse and worse."

Upon cross-examination the witness was asked:

"And as the court has ruled, we won't go into what you did see; but, whatever it was that you saw, you went away feeling very much shaken and very

much shaken up and nervous because of what you had seen? A. No; it was what I felt. Q. That is, after what you had seen? A. Yes, sir."

Upon redirect examination the witness stated:

"By 'what I felt' I mean the concussion that I received at the time of the collision"; and then, on recross-examination: "I have used two phrases, 'nervous shock' and a 'concussion.' I mean a nervous shock."

This is the only testimony in the case as to the collision and its effect upon the plaintiff. The physical effect upon him which was caused by the collision was throwing him forward in the seat, but the force was not sufficient to upset the board used for playing cards, which rested upon the laps of the plaintiff's testator and his associates with whom he was playing. So far as appears, no physical injury was caused to the plaintiff by the collision. At the time he thought nothing of it, and the game of cards continued until they noticed that persons wounded in the rear car were being carried past the car in which the plaintiff's testator was sitting. He then left the car, saw injured persons being carried forward, left the train, and went to his office, and subsequently went home. Upon this testimony, without that of the medical witnesses to which attention will be called, I do not think that a verdict that the plaintiff had sustained any injury in consequence of this collision can be sustained. All railroad trains traveling at a high rate of speed are subject to more or less violent movements, and a sudden stoppage of a train would certainly cause as much of an interference with a passenger as that described by the plaintiff. He sustained no physical injury. So far as appears, he did not even strike the seat in front, or his associates with whom he was playing cards. He was not a passenger on the defendant's road, and there is no claim of any negligence on the part of the company operating the train upon which the plaintiff was a passenger.

It was stipulated at the commencement of the trial that the plaintiff was a passenger in a car of the New Haven Road on the 8th day of January, 1902, at the time that a collision occurred which was caused by the locomotive of a train belonging to the defendant running into the rear car of the train of the New Haven Road in which the plaintiff was riding, and that, if there be any liability at all, the liability is on the New York Central, and the New York Central will respond for any judgment that may be entered against it. But to entitle the plaintiff to a verdict, there must be evidence that the accident or collision for which the New York Central Road was responsible caused the plaintiff's injury for which there was a liability; and, in the absence of evidence to show that there was caused by the accident a physical injury to the plaintiff's intestate, there was no cause of action. This principle has been settled in this state by Mitchell v. Rochester Railway Co., 151 N. Y. 107, 45 N. E. 354, 34 L. R. A. 781, 56 Am. St. Rep. 604. In that case the court say:

"The single question presented is whether the plaintiff is entitled to recover for the defendant's negligence, which occasioned her fright and alarm, and resulted in the injuries already mentioned. While the authorities are not harmonious upon this question, we think the most reliable and best con-

sidered cases, as well as public policy, fully justify us in holding that the plaintiff cannot recover for the injuries occasioned by fright, as there was no immediate personal injury. * * * Assuming that fright cannot form the basis of an action, it is obvious that no recovery can be had for injuries resulting therefrom. That the result may be nervous disease, blindness, insanity, or even a miscarriage, in no way changes the principle. These results merely show the degree of fright or the extent of the damage. The right of action must still depend upon the question whether a recovery may be had for fright. If it can, then an action may be maintained, however slight the injury. If not, then there can be no recovery, no matter how grave or serious the consequences. * * * The difficulty which often exists in cases of alleged physical injury, in determining whether they exist, and, if so, whether they were caused by the negligent act of the defendant, would not only be greatly increased, but a wide field would be opened for fictitious or speculative claims. To establish such a doctrine would be contrary to principles of public policy. * * * These considerations lead to the conclusion that no recovery can be had for injuries sustained by fright occasioned by the negligence of another where there is no immediate personal injury."

We are then brought to a consideration of the question as to whether the medical testimony in this case is sufficient to justify a finding that the injuries of which the plaintiff complained resulted from the physical effect produced upon him by the collision to which he testified. Dr. Pierson was called as a witness for the plaintiff, and testified that he saw him first on the night of May 2, 1902, at his home, in Stamford. The accident having occurred on January 8, 1902, this was nearly four months after. He testified that the condition in which the plaintiff was at the time disclosed that he was suffering from dilatation of the heart and from valvular disease; that the plaintiff was sitting up in bed, leaning forward, covered with cold perspiration, gasping for breath, blue in color, and coughing constantly, and raising a large quantity of bloody mucous; that he was in a very bad condition; his condition was a very desperate one; his pulse very weak; his breathing, in addition to being labored, was very short; that these severe symptoms lasted between one and two hours, and were not entirely cleared up until two days afterwards; that after this œdema cleared up he simply had a general weakness, resulting from his severe attack; that he had had numerous recurrences from that time until the time of the trial, and that his condition then (at the time of the trial) was not so severe as some others; that he was suffering from dilatation of the heart and from valvular disease. This condition was described by the physician as follows:

" 'Dilatation' means an enlargement of the cavities of the heart, due to various causes, but an enlargement and weakening of the muscle walls of the heart. The walls of the heart are, of course, a muscle, just like any other muscle, and, in its normal state, works like any other muscle. In dilatation the muscle would be thin and weakened from some cause, and would not perform its work properly, in the way of forcing blood from the heart into the lungs, and then through the arteries of the body. With respect to valvular disease, there are in different parts of the heart partitions which are separated by trapdoors that we call 'valves.' When our valves are diseased from any cause, and do not shut properly, they either do not allow all of the blood to go out of the heart, or they allow some of the blood to come back. They are closed only partly."

The physician was then asked several questions as to whether the attacks that he had described, and the condition in which he

found the plaintiff, "could have been produced" by reason of shocks suffered by the plaintiff while riding in a railroad car, by reason of a collision between the train including the car in which the plaintiff was riding and another train. This was objected to, whereupon the plaintiff's counsel modified the question by adding thereto "nervous shock," so that the question would be whether the condition that the witness had described "could have been produced by reason of nervous shock suffered by the plaintiff while riding in a railroad car by reason of a collision." This question was objected to, when it was again modified, the defendant's counsel stating, "Your honor's memory is precisely mine, but my position is that the question does not exclude physical injuries, and the plaintiff said that he received no bruises," to which the plaintiff's counsel replied, "We do not claim physical injuries," when the question was again modified as follows:

"Can you state with reasonable certainty whether the attacks and condition you have just described, and from which you found the plaintiff suffering, could have been produced by reason of nervous shock suffered by the plaintiff while riding in a railroad car, by reason of a collision between the train including the car in which the plaintiff was riding and another train; that the plaintiff was not thrown to the floor of the car, and received no bruises, but received a severe nervous shock, and was thrown forward?"

This question, in this form, does not seem to have been objected to, and the witness answered, "I think it could." The witness was then asked a hypothetical question which assumed certain facts testified to, and he was asked:

"Can you state with reasonable certainty whether, in your opinion, the attacks and condition which you found the plaintiff suffering from, and which you have described to the jury, were or were not produced by such nervous shock while the plaintiff was riding in such car, by reason of such collision?"

To which the witness replied, "I do not think I can answer that question 'Yes' or 'No.'"

Upon cross-examination the witness testified that he based his opinion upon the condition that he found the plaintiff in in May, plus his former medical examinations; that the witness got that information from his life insurance examination in writing, and from the answers given by him to the questions put; so that the opinion of the witness given upon the stand had for its basis facts stated in the hypothetical question, the facts that the witness gleaned from his papers which he had read, which he had described as life insurance applications or answers made by the plaintiff, and statements made by the plaintiff to the witness, and information which the witness extracted from the medical report; that each one of these was his essential basis for his final conclusion; that, in his opinion, the shock caused the dilatation of the heart of this plaintiff at once; that different causes act upon the heart; it is not necessarily a physical cause; that he believed that the shock caused an instantaneous change in the heart, certainly within a short time; that he was speaking of mental shock, and not physical; that a great many books upon the subject mention the fact that very profound, serious, and lasting troubles of the heart come from

mental shock; that he did not mean necessarily that a man must have his leg broken or his arm broken; that he meant a shock, as shock is generally understood, and that is that profound depression of the nerve centers resulting from some very serious impression upon them, which produces these profound after-effects; and further:

"It is very difficult to define 'shock' exactly. Of course, physical shock you may define as being a profound, depressing effect upon the nervous system, resulting from a crash, like an arm being broken or a severe bodily injury. That might be called physical shock. Mental shock, if they choose to call it that, would be shock producing the same purely depressing effect upon the nervous system, which in its turn would give rise to very serious disturbances in other organs, not accompanied by bodily injury. It is a very difficult thing to define. It is the latter that I meant in this case."

And the witness stated that he assumed that the plaintiff's intestate was in good health. It thus appears that the physican assumed that prior to the shock the plaintiff's intestate was in good health; that he had also based his opinion upon an examination of certain life insurance examinations which were not introduced in evidence.

Another physician, who had examined the plaintiff's intestate just before the trial, was called, and testified that he found the plaintiff's intestate had a dilated heart—a leak in two valves; that the valves did not hold blood as they should; and that, when the plaintiff's intestate first went to see the witness, he had a great deal of contraction of the arteries. He was then asked a hypothetical question assuming the facts that had been testified to, and was asked whether "the condition of his heart could have been produced by such nervous shock while the plaintiff was riding in such car, by reason of such accident." That question was objected to as improper in form, counsel stating:

"I further object to the question on the ground that it does not state all the facts upon which the case has thus far proceeded, in that it does not exclude the element of physical injury; meaning by 'physical injury' bodily injury. I further object that the question is conjectural and uncertain."

This objection was overruled, the defendant excepted, and the witness stated that it could. He was then asked, "Please state your opinion whether it could be?" to which there was the same objection, same ruling, and an exception, and the witness answered, "I think it could be."

After the plaintiff had rested, there was medical testimony introduced by the defendant; and at the close of the testimony the defendant moved to dismiss the complaint and direct a verdict for the defendant, which motion was denied, and the defendant excepted. The court then instructed the jury that no recovery could be had where it is alleged that an injury was caused by fright, with no attendant immediate personal injuries; that the question of shock and the question of fright are altogether different factors; that "shock" does not mean fright, nor does "fright" mean shock, but fright may cause the shock, and where it is the sole cause of the shock, and there is no attendant personal injury, there can be no

recovery, but that the jury could allow to the plaintiff such sum of money as they feel will compensate him for the injury he has suffered, and which they find immediately and necessarily flows from such accident. The defendant then excepted to the court's allowing the jury to say whether the present condition of the plaintiff was caused by shock, and asked the court to instruct the jury that if they find as a fact that, in whatever condition they found the plaintiff to-day, such condition is due solely to a mental or nervous shock, and not from any physical injury, then the jury must not award damages for such condition. The court refused to so charge, and the defendant excepted. The court was further asked to charge that, if the jury found that there was no physical injury as a cause for the present condition of the plaintiff, then no substantial damages can be awarded by the jury for that condition, which was refused, and to which the defendant excepted.

I think it was error to allow the physician to testify as to what could have caused the physical condition of the plaintiff at the time of the trial, and I think the defendant was entitled to have the jury instructed in accordance with the first and third requests to charge. The witnesses called for the plaintiff did not testify that the condition in which the plaintiff was found at the time of the trial was with reasonable certainty to be ascribed to any injury that the plaintiff received from the collision. He was simply thrown forward in his seat, and, so far as appears, did not come in contact with anything. There could have been no mental shock or effect upon the nervous system caused either by any physical injury that was received by the plaintiff from the collision, or which was the result of any immediate effect of the collision upon the plaintiff. He testified that he did not think much about it at the time; that there was nothing to it, and he resumed his game of cards. All that the physicians testified to was that a certain physical condition in which they found the plaintiff could have been produced by a nervous shock; but there was no evidence that this nervous shock was caused by the collision, nor was there evidence that in the opinion of any expert this nervous shock did follow from a physical injury, the result of this collision. As to what could have happened in consequence of his presence in the car which collided with another train, or what could have been the effect on the plaintiff's heart as a result of a shock caused by such a collision, was speculative and insufficient as evidence to be the basis of a recovery. As I understand it, what the law requires is evidence that a condition for which a recovery is sought was caused by an injury to the plaintiff caused by a negligent act of the defendant, and, where a physical injury results, the law allows an expert to testify that in his opinion the condition was with reasonable certainty caused by the act of the defendant; but there must be some connection between a physical injury caused by the negligent act, and the condition for which a recovery is sought. The opinion of a witness that such a condition could result from such an injury is not proof of the fact that the condition did result from it. The evidence, therefore, of these physicians, which was objected to by the defendant, and

which was admitted, and to which the defendant excepted, that this condition of the plaintiff could have been caused by a mental shock experienced by him in conseqence of what happened at the time of this collision, was incompetent evidence, as not tending to prove the fact, the burden of proving which was upon the plaintiff, that the condition that the physician found the plaintiff in four months after the accident had any relation to a physical injury that the plaintiff received at the time of this collision. It may be that the mental effect upon the plaintiff of seeing the dead and wounded carried out of the wrecked cars so affected him as to accelerate the disease with which he was suffering, but for that purely mental effect upon the plaintiff I think there can be no recovery. There is nothing to justify the jury in finding that there was any physical injury caused to the plaintiff by this collision. No physician has testified that in his opinion the effect on the plaintiff of being thrown forward, dissociated from the mental effect produced by seeing those who had been injured, did produce nervous shock that could have caused this condition. The result of all the testimony simply is that, in the opinion of a physician, a nervous shock or mental shock was sufficient to cause this condition; but, as I read this testimony, there is not a particle of evidence to show that any mental or nervous shock was produced by the collision, so that it was proved as a fact that the collision was the proximate cause of the plaintiff's condition. If no one had been seriously injured as the result of this collision, and the sole effect had been to throw the plaintiff forward as he has testified to, and the car had then proceeded to the depot, there is no reason to suppose from this evidence that the plaintiff would have suffered any serious effect from the accident. But the testimony of a physician that nervous or mental shock could have caused the condition in which the plaintiff was found at the time of the trial was not competent to show that the physical effect of this accident did cause the plaintiff's intestate's condition at the time of the trial. Such being my view of the effect of the evidence, it was clearly incompetent to admit the testimony of the physician which was admitted over the objection and exception of the defendant, and it was error for the court to refuse to instruct the jury as requested. I think, therefore, both for the admission of the testimony to which attention has been called, and the refusal to charge these requests, there was substantial error committed, which requires us to reverse the judgment.

For these reasons the judgment and order appealed from are reversed, and a new trial ordered, with costs to the appellant to abide the event.

O'BRIEN, P. J., and McLAUGHLIN, J., concur.

LAUGHLIN, J. (dissenting). This action was brought by the decedent to recover for injuries sustained in the so-called tunnel accident. He testified in his own behalf upon the trial, but died after the entry of judgment, and his executrix was substituted. The negligence of the defendant and freedom from contributory

negligence on the part of the decedent were conceded upon the trial, and the only issue litigated was concerning the injuries and damages. The jury rendered a verdict for $12,500. The decedent was 56 years of age, and his annual income was from $3,000 to $4,000 from his services; and from the time of the accident to the date of the trial, some two years thereafter, he was unable to earn more than $500, and, according to the evidence introduced on his part, he was permanently disabled. In reviewing a verdict where, as here, the action will abate if a new trial be awarded, and especially where the only question presented relates to the damages, the court should not, I think, scrutinize the record of the trial with the same strictness as if the case could be tried again.

The appellant contends, in substance, that the decedent sustained no injury from the collision, or at least only injuries resulting from fright, as distinguished from physical injuries, and that the court erred in overruling its objection to certain questions propounded to medical experts. The case of Mitchell v. Rochester Railway Company, 151 N. Y. 107, 45 N. E. 354, 34 L. R. A. 781, 56 Am. St. Rep. 604, upon which the appellant relies, should, I think, be confined strictly to cases of injuries from fright, without any direct physical injury or shock, caused by the negligence of the parties sued. In that case the negligence of the defendant consisted in driving the team attached to the horse car so close to a pedestrian, without giving any signal, that before she discovered the approach of the horses she was between their heads; but she did not come in contact with them, and merely sustained a fright such as she might have sustained at any distance on witnessing an accident. The subsequent illness she and her physicians attributed to this fright, but the Court of Appeals were of opinion that it was contrary to public policy to allow a recovery in such case. In the case at bar, however, the decedent was a passenger, and he received, as a direct consequence of the negligent collision, which caused "a very heavy crash," a physical jar, which threw him over in the seat, and at the same time he sustained a nervous shock, as the direct result of the physical jar which precipitated him forward; and, although he did not sustain any physical bruise or injury, it is manifest that for the time being, and until his forward movement was stopped and he landed safely, he may well have believed that he was sustaining grave injuries. His own testimony quite satisfactorily shows that from the time of that collision he suffered from the consequences of the collision, in that theretofore he had been free from nervousness, and the action of his lungs and heart was good, and after the accident he at once became extremely nervous, and the action of his heart and lungs was so affected that he was unable to walk up a hill of moderate grade without assistance, although he had theretofore been able to do so with ease and freedom from experiencing any difficulty with either heart or lungs. The evidence shows that this condition grew worse until the time of the trial, when he was suffering from dilation of the heart and valvular disease of the heart. Assuming the testimony of the decedent concerning his

condition of health prior to the accident and the changed condition immediately following the accident to be true, I am of opinion that the enlargement of the cavities of his heart and the weakening of the muscles of the walls of his heart are accounted for by the negligence of the defendant in causing the collision and crash. Moreover, I am of opinion that the testimony of the decedent is not improbable. His case, however, did not rest upon his testimony alone. Medical testimony was introduced in his behalf, based upon hypothetical questions reciting the history of his case, tending to show that the nervous shock he received at the time of the collision was the direct cause of the condition in which his heart was found at the time of the trial.

It contended on the part of the appellant that the court erred in overruling the appellant's objection to a hypothetical question propounded to Dr. Quimby. The doctor had practiced his profession as a physician and surgeon for about 25 years, and it was expressly admitted that he was qualified to testify as an expert. He testified that he examined the decedent on the 3d and 15th day of December—presumably 1903, nearly two years after the accident—and discovered a leak in two valves of the heart, producing a condition known as a "dilated heart," and that "he had a great deal of contraction of the arteries, arterial tension, strain." He then explained that by "dilation of the heart" is meant a condition in which the heart cavity is slightly enlarged, and in which the walls of the heart are weakened, "relative to the amount of work which they are called upon to do." The doctor was then asked a double hypothetical question, reciting the history of the case, and inquiring whether he could state with reasonable certainty whether the conditions he found on the examination and had described to the jury were or were not produced by the nervous shock sustained by the plaintiff while riding in the car at the time of the collision; and the question then contained some further contentions based upon the testimony, and closed by inquiring whether the physician could state with reasonable certainty whether the attacks of œdema of the lungs shown by the testimony, and the condition of the plaintiff's heart, "could have been produced by such nervous shock while the plaintiff was riding in such car, by reason of such accident." Counsel for the appellant objected to the question upon the ground, among others, that it was improper in form and conjectural and uncertain. The objections were overruled, and exception taken. The witness answered, "I can." The witness was then asked, "Please state your opinion whether it could be?" to which the same objection was interposed and overruled, and exception taken, and the witness answered, "I think it could be." It is contended in the first place that the evidence was improper for the reason that the witness was not called upon to say that he was able to answer with reasonable certainty. It will be observed that the former of the two inquiries embraced in the one hypothetical question called for the opinion of the witness to be stated with reasonable certainty, and the latter did not. Attention was not specifically drawn to this by the objection interposed. It is not clear but that the physician

intended to testify that he was able to say with reasonable certainty that all of these conditions were attributable to the accident, and no significance in that regard is to be attached to the form of his answer. However this may be, I am of opinion that the evidence was entirely competent—its weight, of course, being for the jury— even though the physician was only able to state that the conditions found by an examination at or near the time of the trial might or could have been caused by the accident. It would then be for the jury to say, on the testimony of the plaintiff, giving minutely, the history of his prior and subsequent conditions, whether or not they were so caused. In this regard, I think there is clear distinction which has been recognized by the courts between expert testimony as to the cause of known existing injuries, and expert testimony as to what may result in the future from present known and existing injuries. Bruss v. Met. St. Ry. Co., 66 App. Div. 554, 73 N. Y. Supp. 256, and cases cited. In the former case, I believe it is entirely competent for the expert to say, in answer to a hypothetical question reciting the circumstances of the accident and the existing condition of the injured party, that the injuries from which it is known that he is then suffering might or could have been caused by the accident; but in the latter case the jury, being unable to have before them the testimony of the patient as to the history of the case in the future, will not be permitted to speculate as to future conditions upon medical evidence merely to the effect that a certain condition may result, but will only be permitted to consider evidence as to future conditions that is based on medical opinion supported by the testimony of the physician that he is able to state from his experience, with reasonable certainty, the conditions that will follow in the future.

The appellant also urges an exception to the reception of the evidence of a physician who made a physical examination of the plaintiff about two years and a half before the accident for the New York Life Insurance Company on an application for life insurance. The objection to the evidence was upon the ground that it was too remote. The object of calling the physician was to show that the heart and lungs of the decedent were at that time in first-class condition, and he so testified. This was merely corroborative to some extent of the testimony of the decedent as to the condition of his heart and lungs before the accident. I am of opinion that it was entirely competent, and not too remote.

I am therefore of opinion that the judgment and order should be affirmed, with costs.